NOT FOR PUBLICATION
## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re Towne, Inc. and DMD Towne, LLC, *Jointly Administered* | |
| The Margolis Law Firm, L.L.C.,<br>        Appellant | Civ. No. 11-5435 (KSH) |
| vs. | |
| BMW Financial Services NA LLC,<br>        Appellee | OPINION |

**Katharine S. Hayden, U.S.D.J.**

### I.     Introduction

In this bankruptcy appeal, Appellant The Margolis Law Firm L.L.C., which served as Special Counsel to the debtors in the underlying bankruptcy case, appeals an order of the bankruptcy court denying its motion to collect fees and expenses from proceeds of the sale of the secured creditor's collateral. Because the record does not support the claim of entitlement to share in these proceeds, the Court affirms the decision of the bankruptcy court.

### II.    Facts and Procedural History

The facts and procedural history are drawn from the submissions included in the record on appeal. *See Fed. R. Bankr. P.* 8006.

#### A. The Underlying Bankruptcy Case

The underlying bankruptcy action involved two affiliated debtors: Towne, Inc. ("Towne") and DMD Towne, LLC ("DMD") (collectively "Debtors"). (Sternheimer Aff., Appellant's R. Appeal No. 9, at ¶¶ 1–2 ("Sternheimer Aff.").) Towne was an authorized BMW

1

dealer and DMD owned the property in Oyster Bay, New York, on which Towne operated. (*Id.* ¶¶ 1–2, 4.) Donald and Madeline Ploetner were the shareholders of and guarantors for the Debtors. (*Id.* ¶ 5.) Towne filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code on February 5, 2009, and DMD similarly filed on April 6, 2009; the bankruptcy court consolidated the cases on May 7, 2009. (*Id.* ¶¶ 1–2) Neither the Debtors nor the Ploetners are parties to the present appeal.

BMW of North America, LLC ("BMW NA") is the franchisor that authorized Towne to serve as a BMW dealer. BMW Financial Services NA, LLC ("BMW FS") was Towne's primary secured creditor and held a perfected first priority security interest on most of Towne's assets. (*Id.* ¶ 3.) BMW FS also held a first priority, perfected lien on DMD's real property. (*Id.* ¶ 4.) At the time that Towne filed for bankruptcy, Towne and DMD owed a combined debt of $9,006,951.67 to BMW FS. (*Id.* ¶ 6.)

BMW FS believed that it was better positioned than the Debtors to sell the Debtors' franchise and property, and on March 6, 2009, it filed a motion for relief from the bankruptcy stay, seeking the ability to take immediate possession of the collateral. (*Id.* ¶ 7.) On March 11, 2009, the bankruptcy court authorized the Debtors to retain The Margolis Law Firm L.L.C. ("Special Counsel") as special counsel. (Appellant's R. Appeal No. 6, Ex. B.) On April 1, 2009, Special Counsel filed opposition to the motion for relief from the bankruptcy stay and informed the bankruptcy court that it had procured a stalking horse bidder, James Messinio,[1] who offered to purchase the dealership and real estate for $6,000,000. (Sternheimer Aff. ¶ 8.) On April 7,

---

[1] The parties disagree on the spelling of Messinio's last name. (*See* Special Counsel Br. 6 ("Messineo"); BMW FS Br. 7 ("Messinio").) The Court will spell the name as "Messinio" to be consistent with the bankruptcy court hearing transcripts. (*See* Appellant's R. Appeal No. 19, at 7:17–18.)

2

2009, the bankruptcy court granted the motion for relief from the stay. (*Id.* ¶ 10.) Because of the outstanding offer from Messinio, BMW FS formally agreed that it would not pursue its state foreclosure action, but that agreement was conditioned on several requirements, including that contracts for sale must be executed by April 9, 2009, a motion for approval of the sale be filed by April 16, 2009, and an auction be conducted on May 19, 2009. (*Id.* ¶¶ 11–12.)

Ultimately, the parties never completed the sale to Messinio. The main stumbling block in the sale is that on April 6, 2009, the Debtors filed an adversary proceeding against BMW FS and BMW NA. (*Id.* ¶ 15.) Because the proposed sale would have been for less money than the value of BMW FS's lien on the Debtors' franchise and property, a sale could not be forced under 11 U.S.C. § 363(f)(3) without BMW FS's consent. (*Id.*) Due to the ongoing litigation, BMW FS indicated that it would not consent to sale unless the Debtors and their principals signed a release. (*Id.* ¶¶ 14–15; *see also* Appellant's R. Appeal No. 14, Ex. G (copy of release eventually reached between BMW of North America, LLC and Chapter 7 trustee).) The Debtors refused to sign the release and Messinio withdrew his offer. (Sternheimer Aff. ¶¶ 17–19.)

On June 24, 2009, Special Counsel sought to reduce BMW FS's lien to $6,000,000, which would have removed BMW FS's statutory ability to halt the sale. (*Id.* ¶ 19.)

At an auction sale on June 29, 2009, John Staluppi offered a high bid of $5,400,000, but because Debtors again refused to agree to the releases that BMW FS demanded, the deal collapsed. (*See id.* ¶ 20; Appellant's R. Appeal No. 14, Ex. J.)

On August 11, 2009, the bankruptcy court converted the case from Chapter 11 to Chapter 7 and appointed Joseph J. Newman as the Chapter 7 trustee of the Debtors' estate. (Sternheimer Aff. ¶ 21.) Shortly thereafter, Special Counsel withdrew from the matter. (*Id.* ¶ 22.) Following the conversion, BMW NA "sent application packages to all of the candidates who expressed

3

interest during the Chapter 11 proceeding, whether those parties had been identified by Special Counsel or not, as well as several additional parties who expressed an interest in purchasing the assets." (*Id.* ¶ 23.) After reviewing sealed bids, BMW FS and the Trustee identified affiliates of Len Stoler, Inc. ("LSI") as the successful bidders, with a purchase price of $5,525,000. (*Id.* ¶ 24.) On behalf of the Debtors, the Trustee executed the releases that had thwarted the earlier sales. (*Id.* ¶ 25.)

On January 7, 2010, the Trustee filed a motion to approve the sale of the Debtors' assets to LSI; the motion included a carve-out from collateral in the amount of $177,000 for the benefit of Trustee, as well as a ten percent distribution for general unsecured claims. (*Id.* ¶ 26.) The bankruptcy court granted the motion. (*Id.*; *see also* Appellant's R. Appeal No. 6, Ex. C (transcript of hearing on motion).)

Special Counsel later filed a motion for fees and expenses. On July 20, 2010, the bankruptcy court granted $84,585.11 in fees and $3,626.90 in expenses for service from March 11, 2009 through November 24, 2009. (Appellant's R. Appeal. No. 3.)

### B.  The Motion for Payment from the Collateral

On October 18, 2010, Special Counsel filed a "motion to enforce the Court's order entered on July 20, 2010, directing compensation of Special Counsel." (Appellant's R. Appeal No. 5.) In the supporting brief, Special Counsel alleged that the carve-out agreement circumvented the Bankruptcy Code's priority scheme and that Special Counsel was entitled to super-priority status under 11 U.S.C. § 506(c). (*See generally* Appellant's R. Appeal No. 6.) On June 14, 2011, the bankruptcy court held oral argument. (Appellant's R. Appeal No. 19.)

On August 10, 2011, the bankruptcy court denied the motion. (*See* Appellant's R. Appeal No. 20 (order); Appellant's R. Appeal No. 21 (opinion) ("Bankr. Ct. Op.").) In his

4

opinion, Judge Steckroth first observed that the general rule in bankruptcy litigation is that counsel to the debtor may obtain compensation only from the debtor's estate. (Bankr. Ct. Op. 4 (citation omitted).) But an exception exists under 11 U.S.C. § 506(c), which permits a claimant to recover expenses if the claimant can demonstrate that "(1) the expenses are reasonable and necessary for the preservation or disposal of the property; and (2) the expenditures provide a direct benefit to the secured creditors." (*Id.* (citations omitted)). Special Counsel argued that "it preserved BMW FS's collateral by preventing BMW NA from terminating the franchise and thereby diminishing the value of the collateral." (*Id.* at 5.) The court rejected this argument for two reasons: first, even if Special Counsel "incidentally prevented BMW NA from terminating the franchise, its services were primarily in pursuit of a sale on the Debtors' behalf, and therefore do not qualify as a benefit under section 506(c)"; and second, the court concluded that Special Counsel's claim that it helped avert the franchise's termination was "purely speculative," noting that after the case was converted to Chapter 7, BMW NA assisted the Trustee in finding prospective buyers and did not terminate the franchise. (*Id.*) Further, the court found unavailing Special Counsel's arguments that its primary objective was to protect both Debtors and BMW FS, noting that Special Counsel took many actions in the course of its representation that stood in direct opposition to BMW FS's interests, including: attempting to reduce the lien to $6,000,000, opposing stay relief, and participating in other litigation against BMW FS. (*Id.*) Therefore, the court concluded that Special Counsel's services primarily benefited the Debtors and the Debtors' principals, and that any benefit to BMW FS was purely incidental and thus outside the scope of section 506(c). (*Id.* at 6.)

As a secondary argument, Special Counsel argued that BMW FS consented to the incurrence of Special Counsel's expenses by entering the forbearance agreement with Debtors,

5

"whereby [BMW FS] agreed to forego exercising its rights under an Order granting relief from the automatic stay." (*Id.* at 8.) The court rejected this argument, concluding that cooperation does not automatically imply consent, and that arguments for consent are problematic given the number of activities Special Counsel undertook which were directly adverse to BMW FS. (*Id.*)

Special Counsel's final argument was that the Trustee and BMW FS secretly colluded to keep Special Counsel out of the carve-out. The court found this argument unpersuasive because Special Counsel was provided notice of the motion to approve the carve-out and did not object. (*Id.* at 7.) Accordingly, the court rejected Special Counsel's arguments and denied the motion. (*Id.* at 8.)

On August 24, 2011, Special Counsel filed a motion for reconsideration. (Appellant's R. Appeal. No. 22.) On September 14, 2011, the bankruptcy court held oral arguments and denied the motion in a decision read from the bench. (Appellant's R. Appeal No. 26–27.)

On September 20, 2011, Special Counsel filed a notice of appeal. [D.E. 1.] The Court has determined that the briefs and the record are sufficient to decide the matter and that oral argument is therefore unnecessary. *See Fed. R. Bankr. P.* 8012.

### III. Parties' Arguments

#### A. Special Counsel's Arguments

Special Counsel's brief presents three points in support of its appeal: that Special Counsel is entitled to recover fees and expenses under 11 U.S.C. § 506(c); that BMW FS is estopped from denying that it benefited from Special Counsel's services "because [BMW FS] secretly collaborated with BMW NA (Franchisor) and Debtors' Trustee for the purpose of achieving various unlawful objectives"; and that BMW FS impeded the sale of the Debtors' estate in order to secure releases in violation of New York law. (Special Counsel Br. i.)

6

Special Counsel argues that an attorney's claim for fees and expenses may be elevated to super-priority status under section 506(c) "so long as (1) the services were necessary in order to preserve or dispose of the secured creditor's property; (2) the amounts charged for such services were reasonable; and (3) the expenses were incurred for the primary benefit of the secured creditor." (*Id.* at 14 (citation omitted).) To that end, Special Counsel submits that "there can be no denying the fact that Special Counsel's services were aimed squarely at preserving and disposing the collateral" because Special Counsel fought BMW NA's attempts to obtain relief from the automatic stay to terminate the franchise. (*Id.* at 17.) Indeed, Special Counsel argues that BMW FS deliberately ignored the risk that it would be harmed by the termination of the franchise because it was "collaborating with and assisting [BMW NA] who had improperly lined up the sale of the Franchise and Facilities to a 'favorite son', LSI." (*Id.* (emphasis removed).) Special Counsel argues that its other services included exposing the Debtors' estate for sale through advertising and procurement of bidders, including the solicitation of Messinio as a stalking horse bidder. (*Id.* at 20.) Special Counsel submits that these services were necessary to preserve the collateral and that because these services could be reasonably expected to benefit the secured creditor, Special Counsel is entitled to payment from the proceeds of the sale of the collateral under section 506(c). (*Id.* at 21–22.)

In the alternative, Special Counsel argues that BMW FS consented to Special Counsel's efforts because it "watched Special Counsel work diligently to sell the dealership for maximum value, knowing that it intended to deceitfully and quietly execute a carve-out agreement that would leave Special Counsel uncompensated." (*Id.* at 24.) Special Counsel emphasizes BMW FS's decision to forbear from exercising its rights under the order granting relief from the

bankruptcy stay and describes BMW FS's "excuses for such forbearance" as "both weak and unpersuasive." (*Id.* at 25.)

Special Counsel next argues that BMW FS should be estopped from denying the benefits it received as a result of Special Counsel's services because while Special Counsel sought bids for the Debtors' franchise and property, "Franchisor and Lender were, secretly, nurturing a budding relationship with LSI." (*Id.* at 26.) In support, Special Counsel includes in his brief the text of emails obtained in discovery, showing that BMW NA and LSI had entered into discussions over Towne's franchise in early 2009, and that those discussions continued throughout the course of the bankruptcy litigation. (*See id.* at 26–30.) Special Counsel also notes that in June 2009, BMW FS committed to a loan of $10,000,000 to LSI. (*Id.* at 31 (citing Appellant's R. Appeal No. 14, Ex. A).)

Special Counsel last argues that if the bankruptcy court had not converted the proceeding to Chapter 7, then 11 U.S.C. § 1129(b) would have permitted the sale to proceed notwithstanding the absence of BMW FS's consent, and that conditioning the sale of a franchise on the seller's willingness to sign a release violates New York law. (*Id.* at 45–47.)

### B. BMW FS's Arguments

BMW FS argues that the moving party carried the burden of demonstrating that the secured creditor benefited from its services, that the movant must establish "in quantifiable terms that it expended funds directly to protect and preserve the collateral," and that those actions were undertaken primarily for the benefit of the secured creditor. (BMW FS Br. 17–18 (citations and emphasis omitted).) BMW FS submits that it initiated state court proceedings to recover the collateral before Debtors initiated bankruptcy proceedings, and that even though it obtained relief from the bankruptcy stay, it agreed to cooperate with Debtors and ultimately did not need

to use the state court remedy because it negotiated a deal with the Trustee following the Chapter 7 conversion. (*Id.* at 19.) As to Special Counsel's arguments that BMW NA would have terminated the franchise if not for Special Counsel's intervention, BMW FS argues that the facts do not support the claim, noting that "after the case was converted and the Trustee appointed, BMW NA did not terminate the franchise, but assisted the Trustee with his marketing efforts, providing pre-application packets to all interested parties and reviewing the ones that were completed and returned by prospective purchasers." (*Id.* at 19–20.) BMW FS further argues that Special Counsel made no attempt at quantification even though Special Counsel undertook some actions, such as attempting to diminish BMW FS's lien, that did not benefit BMW FS. (*Id.* at 20.) BMW FS also asserts that no benefit accrued from Special Counsel's efforts because it was unable to complete a sale. (*Id.* at 21.)

On the question of consent, BMW FS argues that a secured party's consent is not "lightly inferred" and that contrary to Special Counsel's assertions, BMW FS was an active participant in furthering the sale of the bankruptcy estate. (*Id.* at 26–27.)

On the issue of improper collaboration with LSI, BMW FS points out that LSI applied for financing ahead of the Chapter 11 sale because Special Counsel's bid procedures required that bids be free of financing contingencies. (*Id.* at 29.) BMW FS also disputes Special Counsel's allegations that it secretly collaborated with Trustee on the carve-out provision, pointing out that even though Special Counsel was not privy to negotiations, it received notice of the proposed carve-out and did not object. (*Id.* at 34.)

BMW FS last disputes Special Counsel's allegation that the cramdown provision would have applied, noting the absence of a filed Chapter 11 plan. (*Id.* at 36.)

9

### C. Trustee's Arguments

The Trustee submits only brief arguments, first noting that Special Counsel did not object to or appeal the order granting the sale and carve-out, thus removing any dispute over that order's validity from the present appeal. (Trustee Br. 5.) The Trustee also argues that the carve-out constitutes BMW FS's "voluntary relinquishment" of the funds to which it was entitled, and that any effort on the part of Special Counsel to join that carve-out "def[ies] fundamental principles of the Bankruptcy Code." (*Id.* at 9 (citations omitted).)

### IV. Standard of Review

When reviewing an order of a bankruptcy court, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." *Fed. R. Bankr. P.* 8013. The Court's review of the bankruptcy court's legal conclusions is *de novo*. *In re Nickels Midway Pier, LLC*, 348 F. App'x 781, 783 (3d Cir. 2009) (citing *In re Schick*, 418 F.3d 321, 323 (3d Cir. 2005)).

### V. Discussion and Analysis

#### A. Fees Under Section 506(c)

##### 1. Framework

Generally, "absent an express agreement to the contrary, the expenses associated with administering a bankruptcy estate are not chargeable to a secured creditor's collateral or claim, but must be borne out of the unencumbered assets of the estate." 4 *Collier on Bankruptcy* ¶ 506.05, at 506-115 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011). At issue here is whether an exception to that general rule applies in the present circumstances. Under 11 U.S.C. § 506(c), "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the

extent of any benefit to the holder of such claim." Though the statute refers specifically to recovery by "the trustee," in this circuit, "administrative claimants other than trustees have standing to recover under § 506(c), particularly when no other party has an economic incentive to seek recovery on the claimant's behalf." *In re Visual Indus.*, 57 F.3d 321, 325 (3d Cir. 1995).

The Third Circuit has held that "to recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a *direct* benefit to the secured creditors." *In re C.S. Assocs.*, 29 F.3d 903, 906 (3d Cir. 1994) (citing *Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp.*, 884 F.2d 80, 86–87 (3d Cir. 1989); *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94–95 (3d Cir. 1986)) (alteration in original). *See also* 4 *Collier on Bankruptcy* ¶ 506.05[9], at 506-129 ("In general, the party seeking the recovery of an expense under section 506(c) bears the burden of proof," including "demonstrating the necessity of the expense, its reasonableness, and the existence and extent of any benefit to the secured creditor." (citations omitted)). Bald assertions of necessity and benefit will not suffice to establish a claim. Instead, the claimant "must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral." *In re Glasply Marine Indus.*, 971 F.2d 391, 394 (9th Cir. 1992); *see also In re C.S. Assocs.*, 29 F.3d at 906. The claimant must also "show that . . . funds were expended primarily for the benefit of the creditor and that the creditor directly benefitted from the expenditure." *In re Flagstaff Foodserv. Corp. (Flagstaff II)*, 762 F.2d 10, 12 (2d Cir. 1985); *see also In re C.S. Assocs.*, 29 F.3d at 906. "Courts have narrowly construed § 506(c) to encompass only those expenses that are specifically incurred for the express purpose of ensuring that the property is preserved and disposed of in a manner that provides the secured creditor with

11

a maximum return on the debt." *In re C.S. Assocs.*, 29 F.3d at 907 (quoting *In re Parr Meadows Racing Ass'n*, 92 Bankr. 30, 35–36 (E.D.N.Y. 1988)).

### a. Reasonable and Necessary

The first element of a claim for fees under section 506(c) is that the claimant's expenditures must have been "reasonable and necessary to the preservation or disposal of the property." *Id.* at 906. Special Counsel argues that the services it provided include: exposing Debtors' franchise and facilities for sale, keeping the facilities open to preserve the franchise, soliciting bids, presenting bidders for an in-Court auction, and consummating purchase agreements with Messinio as a stalking horse bidder. (Special Counsel Br. 20.) Although there is no dispute that Special Counsel undertook these actions, Special Counsel's actions never resulted in an actual sale, and the record therefore does not support Special Counsel's assertions that these actions were necessary to preserve or dispose of the property.

The other parties preserved and disposed of the property without the assistance of Special Counsel. LSI, which ultimately purchased Debtor's franchise and property, had been interested in purchasing the franchise and property before Special Counsel even became involved in the matter. Eliot Wagonheim, an attorney who regularly represents LSI, submitted an affidavit to the bankruptcy court indicating that in early 2007, LSI asked him to represent it in negotiations for the possible purchase of the franchise and property from Towne and DMD. (*See* Appellant's R. Appeal No. 10, at ¶ 1.) These negotiations persisted throughout 2008, and Wagonheim indicates that after Debtors filed for bankruptcy, he contacted Special Counsel only to continue the negotiations, and that when he did so, he "was not responding to any solicitation or communication from" Special Counsel. (*Id.* ¶¶ 3–8.) Robert L. Arangio, who represented Towne and DMD pre-bankruptcy, provided an affidavit affirming that negotiations between LSI

and Debtors began in 2007.  (*See* Appellant's R. Appeal No. 11.)  Therefore, because LSI expressed a purchasing interest prior to the initiation of bankruptcy proceedings and did not rely on any of Special Counsel's solicitations when continuing to express that interest, Special Counsel's efforts to sell Debtors' franchise and property were not necessary for disposal of the property.

The remaining service that Special Counsel argues it provided is keeping the business open so as to preserve Towne's franchise, "which BMW [NA] repeatedly expressed its desire to terminate." (Special Counsel Br. 20.)  The record compels the Court to conclude, however, that the bankruptcy court correctly characterized the threat of franchise termination as "purely speculative." (Bankr. Ct. Op. 5.)  Specifically, although Special Counsel asserts that BMW NA threatened to terminate the franchise and that Special Counsel's actions prevented that termination (*see* Special Counsel's Bankr. Ct. Br., Appellant's R. Appeal No. 13, at 4–5), Special Counsel bears the burden of demonstrating its claim to recover from the secured assets, and it has provided the Court with no facts in the record to substantiate the risk it asserts to have been present.  In essence, the Court is asked to take Special Counsel's word that its actions were necessary, and that is not enough to carry its burden under section 506(c).

Further, as discussed in the facts recounted above, the Debtors' franchise and property could have been sold without conversion to Chapter 7 if the Debtors had agreed to release their claims against BMW FS and BMW NA, and indeed, after Chapter 7 conversion took place, BMW NA did not terminate the franchise but rather permitted a sale to be completed, with Trustee executing the necessary releases.  Thus, Special Counsel has failed to proffer sufficient evidence to support its claim that its efforts were necessary to avoid termination of Towne's franchise.

13

### b. Benefit to Secured Creditors

Additionally, Special Counsel has failed to demonstrate that its "expenditures provide[d] a *direct* benefit to the secured creditors."[2] *In re C.S. Assocs.*, 29 F.3d at 906. Just as the efforts to acquire bidders were not necessary to dispose of the property, the expenditures to acquire bidders did not provide a direct benefit to BMW FS. The only benefit to BMW FS came when LSI agreed to purchase the assets, and LSI arrived at the negotiations independently of Special Counsel's actions. The record therefore does not support the claim that Special Counsel's efforts directly contributed to the sale to LSI.

Also pertinent to this argument is that to recover fees under section 506(c), the expenditures must be made "primarily for the benefit of the creditor." *In re Glasply Marine Indus.*, 971 F.2d at 394; *see also In re C.S. Assocs.*, 29 F.3d at 906. Here, Special Counsel represented Debtors in the bankruptcy court, and many of its actions demonstrate that it was acting primarily to benefit its client, not BMW FS. As the bankruptcy court observed, "many of the services for which Special Counsel seeks reimbursement were contrary to BMW FS's interests, such as drafting pleadings to reduce the lien from $9,000,000.00 to $6,000,000.00, opposing stay relief, opposing a state court replevin action, and conducting research leading to the filing of an administrative proceeding against BMW FS in state court." (Bankr. Ct. Op. 5.) Special Counsel makes no effort to limit its claim for fees to only those actions which were

---

[2] Special Counsel, citing *In re Hotel Associates*, 6 B.R. 108, 112 (Bankr. E.D. Pa. 1980) (quoting *United States v. Henderson*, 274 F.2d 419, 423 (5th Cir. 1959)), argues that the proper inquiry is whether the costs and expenses are those "from which the mortgagee benefited or which might reasonably be expected to benefit the mortgagee." That interpretation, however, is substantially broader than the standard that the text of section 506(c) provides. That distinction appears to exist because *Henderson* applied a different statutory provision under the pre-1978 Bankruptcy Code. *See* 274 F.2d at 422–23. The Court rejects this interpretation and will follow the standard that the Third Circuit has articulated as controlling. *See In re C.S. Assocs.*, 29 F.3d at 906.

primarily for the benefit of BMW FS.  Instead, it argues that all its fees for the entire representation should be recouped from the secured assets, even though many of its expenditures related to conduct that was directly adverse to BMW FS's interests.  Section 506(c) is "narrowly construed . . . to encompass only those expenses that are specifically incurred for the express purpose of ensuring that the property is preserved and disposed of in a manner that provides the secured creditor with a maximum return on the debt."  *In re C.S. Assocs.*, 29 F.3d at 907.  Special Counsel has failed to demonstrate why it should be entitled to claim fees from the collateral for the entirety of its representation when some of that representation, if successful, would have limited the return that BMW FS could expect on the debt.

The Court rejects Special Counsel's alternative argument that BMW FS is estopped from denying that it benefited from Special Counsel's services because of secret collaboration among BMW NA, BMW FS, LSI, and Trustee.  (*See* Special Counsel Br. 26–44.)  Special Counsel cites no case, statute, or other authority to indicate that such a form of estoppel has ever been recognized, and instead dedicates nearly 20 pages of its brief to providing long excerpts from emails between representatives of the parties regarding the litigation and negotiations with LSI.  If the Court were to accept Special Counsel's argument that these negotiations provided an equitable basis for the right to collect fees from the collateral, the Court would effectively add fairness and balancing-of-the-equities components to section 506(c), substantially relaxing the strict standards that the law imposes to recover fees from the secured assets.  *Cf. United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) ("The fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his [or her] personal views of justice and fairness, however enlightened those views may be." (quoting *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d 524, 528 (7th Cir.

15

1986))). Moreover, even taking Special Counsel's allegations as true, there is no dispute that LSI became interested in purchasing Debtors' assets well before bankruptcy proceedings initiated, and notwithstanding Special Counsel's claim that LSI was groomed as a "favorite son," the Debtors could have arranged the sale of their assets to a different buyer by consenting to the release that BMW FS demanded. Special Counsel argues that LSI was a pre-determined buyer, but for that to be the case, BMW FS would have had to know not only that Debtors would refuse steadfastly to consent to a release, but also that LSI would be the high bidder in the post-conversion auction.

### 2. Consent

Special Counsel also argues that it is entitled to fees because BMW FS impliedly consented to Special Counsel's efforts. Specifically, Special Counsel posits that consent is implied by BMW FS's willingness to "watch[] Special Counsel work diligently to sell the dealership for maximum value" and by its decision to forbear from exercising its rights to foreclose after obtaining relief from the bankruptcy stay. (Special Counsel Br. 24–25.)

The language of section 506(c) does not directly provide for consent to result in a claimant's ability to collect from the secured property, but equitable principles have led courts to consider consent as part of broader equitable considerations in the course of administering a bankruptcy case. *See, e.g.*, *In re Hotel Assocs.*, 6 B.R. at 112. "Although a secured creditor may consent to bearing the costs of professional fees incurred by a debtor in possession, 'such consent is not to be lightly inferred.'" *In re Flagstaff Foodserv. Corp. (Flagstaff I)*, 739 F.2d 73, 77 (2d Cir. 1984) (quoting *In re S&S Indus., LLC*, 30 B.R. 395, 398 (Bankr. E.D. Mich. 1983)). Moreover, consent is not demonstrated "merely because a secured creditor cooperates with the debtor." *Id.* (quoting *In re S&S Indus., LLC*, 30 B.R. at 398). When a party does impliedly

16

consent "to the payment of some necessary expenses associated with the secured creditor's insisting that certain activities be undertaken in the bankruptcy case, this certainly should not be construed as an open-ended consent to charge all of the estate's expenses against the secured creditor's collateral." 4 *Collier on Bankruptcy* ¶ 506.05[8], at 506-128.

As recounted above, BMW FS agreed to sit on its rights with regard to closing on Debtors' franchise and property, but it did so in a very limited fashion, providing numerous strict conditions on its forbearance. At most, Special Counsel has demonstrated acquiescence or limited cooperation, which do not independently give rise to consent for Special Counsel to have taken all the actions for which it now seeks compensation.

### B. Other Equitable Arguments

Special Counsel last argues that BMW FS impeded Special Counsel's efforts to sell the Debtors' franchise and property, and that if the Court had not converted the proceeding to Chapter 7, the "cramdown" procedure of 11 U.S.C. § 1129(b) would have compelled BMW FS to sell to the highest bidder. (Special Counsel Br. 45–46.) Special Counsel further argues that it was unlawful for BMW FS and BMW NA to demand a release because the New York Franchised Motor Vehicle Dealer Act, N.Y. Veh. & Traf. Law § 463(k), forbids conditioning sale of a franchise on the procurement of a release. (*Id.* at 47.)

The Court expresses no view on the underlying merits of these arguments because even if they are true, it does not follow that the bankruptcy court should have exercised its equitable discretion to order Special Counsel's fees to be paid from the proceeds of the sale of the secured collateral. If, as Special Counsel argues, the releases that held up the sale were unlawful, that is not a basis for finding that fees should be paid from secured assets rather than unsecured assets. To the extent that Special Counsel is suggesting that it was wrongfully excluded from the carve-

17

out negotiations, the time for objection to any unfair terms was when Special Counsel received notice of the motion to sell the Debtors' assets, which incorporated the carve-out. Accordingly, the bankruptcy court did not err in declining to exercise its equitable discretion to allocate the source of Special Counsel's fees and expenses.

### VI.     Conclusion

For the foregoing reasons, the order of the bankruptcy court is affirmed. An appropriate order will follow.


Date: June 25, 2012                                                                 /s/ Katharine S. Hayden
                                                                                    Katharine S. Hayden, U.S.D.J.